<u>MULTIPLE RIGHTS AGREEMENT</u>

This agreement made as of March 15, 2019 (this "Agreement"), by PRIMO BOYZ RECORDS LLC ("Company"), a New Jersey company located at 6508 Highland Avenue Pennsauken, New Jersey 08110 on the one hand, and CARLOS LEANDRO MOSQUEDA PAZ a/k/a ALEJANDRO MOSQUEDA p/k/a "ALMIGHTY," residing at Villa Carolina 206-6 Calle 513 Carolina 00985-3022 Puerto Rico and with an email address AlmightyCFM@gmail.com (hereinafter referred to as "Artist", "you" or "your") on the other hand.

WHEREAS, Company is desirous of engaging Artist's personal services in connection with the Entertainment Industries;

WHEREAS, Artist deems it is in its best interest to enter into this Agreement and Artist shall provide such personal services on an exclusive basis upon the terms and conditions set forth herein;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:

I.      **STANDARD TERMS AND CONDITIONS**

1. <u>Definitions</u>. All capitalized terms and phrases used in this Agreement shall have the meanings and definitions as set forth in Section VIII of this Agreement, except as may otherwise be defined herein.

2. <u>Term</u>. The Term of this Agreement shall be as set forth in Section II, paragraph 1 below.

3. <u>Exclusivity</u>. During the Term of this Agreement, the services provided by Artist in this Agreement shall be exclusive to Company.

4. <u>Territory</u>. Universe.

5. <u>Scope of Company's Activities</u>. Company agrees to provide the following services in accordance with Sections II – VII of this Agreement:

(a) Section II; Recording: fund and record new original Masters featuring Artist's performances for marketing and distribution at Company's sole discretion;

(b) Section III; Music Publishing: exploit the copyrights in and to all Compositions owned or controlled by you or Artist in accordance with the terms of this Agreement;

(c) Section IV; Tours, Concerts: promote your live performances;

(d) Section V; Merchandising: use and authorize or sublicense others to use your and Artist's Licensed Marks for commercial purposes;

(e) Section VI; Sponsorships and Endorsements: Company shall enter into sponsorship and endorsement agreements as set forth herein; and

(f) Section VII; Management: advise, guide and counsel Artist in the development and furtherance of Artist's career in the Entertainment Industries.

6. <u>Engagement</u>.

(a) During the Term of this Agreement, except as otherwise provided herein, Company hereby engages Artist and Artist hereby agree to provide the following exclusive personal services:

(i) Record and perform as an artist and producer for the purpose of making Master Recordings for Company as set forth in Section II of this Agreement;

(ii) Perform as a songwriter and composer as set forth in Section III of this Agreement;

(iii) Perform as a professional vocalist and performing artist in connection with live performances and concerts as set forth in Section IV of this Agreement; and

(b) In addition to the exclusive personal services provided in paragraph I.6(a)(i)-(iii), you hereby grant to Company the exclusive right to:

(i) use and authorize or sublicense others to use your or Artist's Licensed Marks;

(ii) act as Artist's authorized representative to negotiate the terms of exploitation of your Licensed Marks in connection with products and services;

(iii) act as Artist's exclusive personal manager in the absence of a personal manager to be selected solely by mutual approval of Artist and Company as otherwise set forth in this Agreement; and

(iv) delay or refrain, at Company's election and in its sole discretion, from doing any one (l) or more of the foregoing in paragraph I.6(a)(i)-(iii) and paragraph I.6(b)(i)-(iii) in whole or in part.

7. <u>Consideration</u>.

(a) In consideration for the services to be rendered and rights granted by you hereunder, Company shall pay to you the following percentages of Company's Net Receipts (as defined below in Section VIII, paragraph 4):

| **Services** | **Your Share** |
|---|---|
| Recording | 50% of Net Receipts |
| Music Publishing[1] | 50% of Net Receipts |
|     Publisher's share of public performance | 50% of Net Receipts |
|     All other exploitation | 50% of Net Receipts |
| Tours; Concerts, Personal Appearances | 70% of Net Receipts |
| Merchandising | 50% of Net Receipts |
| Sponsorships; Endorsements | 70% of Net Receipts |
| All Other Entertainment Industry Related Income[2] | 50% of Net Receipts |



(b) Company shall be the only party authorized to collect any and all income, funds, advances, royalties, fees, retainers, and/or other revenues in connection herewith and shall account to you as defined below. Notwithstanding anything to the contrary, Artist's share of Company's Net Receipts shall be subject to any agreement Company enters into with third parties including but not limited to adjustments, escalations, reductions and reserves

---

[1] Artist shall retain one hundred percent (100%) of writer's share of public performance income for its full benefit and use.

[2] Company shall retain for its own benefit the copyright owner's share of any and all neighboring rights royalties payable from all sources, including, without limitation, SoundExchange provided that the sound recordings are distributed independently and Company shall also retain Artist's share in the percentage set forth in All Other Entertainment Industry Income with respect to Artist's respective share of neighboring rights royalties in conjunction with the sound recordings subject to this Agreement. Upon Company's full 100% recoupment of Artist's account of all advances paid by Company hereunder including without limitation Artist Advances, Artist shall no longer be required to contribute Artist's share of SoundExchange income to Company.

8. <u>Power of Attorney</u>. Provided that Company shall use reasonable efforts to consult with you and consider your views with respect to each and every action taken under this clause I.8, you hereby irrevocably appoint Company for the Term of this Agreement as your true and lawful attorney-in-fact to exclusively sign, execute and deliver any and all contracts in your or Artist's name, to exclusively make execute, endorse, accept, collect and deliver any and all checks and notes as your said attorney, to exclusively demand, sue, collect, recover and receive goods, claim money, interest or other items that may be due to Artist or belong to Artist and to exclusively make, execute, and deliver receipts, releases and other discharges therefore under sale or otherwise; and to exclusively litigate, defend, settle, adjust, compound, submit to mediation and/or arbitration and compromise, all actions, suits, accounts, claims and demands whatsoever that currently are or shall be pending in such manner and in all respects as Company shall in its sole discretion deem advisable, including without limitation the Panda Dispute. Without in any way limiting the foregoing Company shall execute and perform any other act, deed, or thing whatsoever that reasonably ought to be done, executed and performed of any and every nature as fully and effectively as you could do if personally present; and you hereby ratify and affirm all acts performed by Company by virtue of this Power of Attorney.

9. <u>Website & Social Media</u> During the Term, you shall grant or cause to be granted to Company administrative level access to all current and future existing Artist websites and Social Media accounts relating to Artist's activities in the Entertainment Industries and Company shall have the exclusive right to write, post, publish, promote and use Artist's professional, group or individual Licensed Marks in connection therewith. Company shall also have the exclusive right to use Artist's Licensed Marks in URLs and Social Media accounts and to exclusively control any URLs and Social Media accounts which incorporate Artist's Licensed Marks. You have the right to approve the content of websites and Social Media pertaining primarily to you within five (5) days of Company's request. You shall not unreasonably withhold your approval and Company's decision shall be final and binding.

10. <u>Accounting</u>.

    (a) Company shall render accounting statements to you within ninety (90) days after the last day of June and December of each year for the preceding six (6) month period. Statements shall be accompanied by the payment of the aggregate monies, if any, payable to you during the accounting period to which the statement relates, after deducting: (i) any and all Artist Advances, recoupable advances and costs under this Agreement, and (ii) the amount of any payments or withholding required to be paid pursuant to any law, or union or guild, rule or regulation. No monies shall be payable to you until payment has been received by Company.

    (b)  At any time within two (2) years after any statement is rendered by Company, you (the "Examining Party") shall have the right to examine Company's books and records with respect to such statement. Such examination shall be: (i) conducted after at least thirty (30) days written notice to Company, (ii) commenced at a mutually convenient time, and (iii) conducted at the Examining Party's sole cost and expense by an independent certified public accountant experienced in the music and entertainment industry and designated by the Examining Party. Such examination shall be made during Company's usual business hours at the place where Company maintains the books and records that relate to monies payable hereunder and that are necessary to verify the accuracy of the statements specified in the Examining Party's notice to Company. The Examining Party's sole right to inspect Company's books and records shall be as set forth in this paragraph 10. Company shall have no obligation to make available any such books and records more than once with respect to each statement rendered hereunder, or more than once during any calendar year. Unless notice is given to Company as provided in this paragraph 10, each statement and other account rendered by Company shall be final, conclusive, and binding upon the Examining Party, and shall constitute an account stated. The Examining Party shall be foreclosed from maintaining

any action, claim, or proceeding against Company in any forum or tribunal with respect to any statement or account due hereunder, or with respect to a claim arising from an audit of Company's books and records, unless: (i) written notice is made to Company as provided in this paragraph 10; and (ii) such action, claim, or proceeding is commenced against Company in a court of competent jurisdiction within two (2) years after the date on which such statement or other account is rendered.

11. <u>Insurance</u>. Company shall have the right in its sole discretion and without obligation, to obtain any forms of insurance (including without limitation life, health, accident or other insurance) on or with respect to Artist as the covered person (individually and collectively the "Artist Policy") and listing Company and/or its assignees as the sole beneficiary(ies) of such Artist Policy. Artist shall diligently cooperate with Company and such insurance carrier(s) and Artist agrees to submit to all required medical examinations, if any, in regard to Company obtaining and/or maintaining such Artist Policy. Company shall use reasonable efforts to keep any and all Artist medical records confidential.

12. <u>Warranties and Representations</u>. Artist warrants and represents that:

(a) (i) you have read, understood and voluntarily agreed to abide by the terms and conditions of this Agreement, (ii) you are under no disability, restriction or prohibition, whether contractual or otherwise, with respect to your right to: (A) enter into this Agreement; (B) perform each and every term and provision of this Agreement; and (C) grant the rights granted to Company hereunder;

(b) the exercise by Company of any and all of the rights granted to Company in this Agreement shall not violate or infringe upon any Common law or statutory rights of any person, including, without limitation, contractual rights, copyrights, and rights of privacy;

(c) Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this Agreement, except as may be specifically provided in this Agreement;

(d) You are or will become and will remain to the extent necessary to enable the performance of this Agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of your services hereunder;

(e) the rights granted herein are free and clear of any claims, demands, liens, or encumbrances;

(f) You shall not enter into any agreement which would interfere with the full and prompt performance of your obligations hereunder;

(g) You are currently and shall remain throughout the Term the sole and exclusive executive, shareholder and owner of your current music publishing administration company LA INDUSTRIA DE LOS INMORTALES, INC., a Puerto Rico corporation and your signature is currently and shall remain during the Term the sole signature necessary to sign on the corporation's behalf and to comply with all of the terms, conditions and obligations hereunder; and

(h) You are at least eighteen (18) years old.

13. <u>Indemnification</u>. Artist shall at all times indemnify and hold harmless Company and any licensee(s), employee(s), agent(s), assign(s), officer(s), director(s), attorney(s), and/or affiliate(s) of Company (collectively the "Indemnified Parties") from and against any and all claims, damages, liabilities, settlements, costs and expenses, including legal expenses, attorneys and paralegal fees, arising out of any alleged breach or breach by Artist of any warranty, representation or agreement made by you herein including without limitation any and all claims made prior to the date hereof (including without limitation the Panda Dispute). Artist shall reimburse Company and/or the Indemnified Parties on demand for any payment made at any time prior to or after the date hereof associated with any liability or claim in respect of which the Indemnified Parties are entitled to be indemnified, including without limitation any liability or claim associated with the Panda Dispute.

With respect to the Panda Dispute and also upon the making or filing of any other claim, action or demand whether or not related to the Panda Dispute, or upon the reasonable belief by Company that such a claim, action or demand is imminent, Company shall be entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the potential liability in issue and all costs associated therewith. Artist shall be notified of any such claim, action or demand and shall have the right, at your own expense, to participate in the defense thereof with counsel of your own choosing; provided, however, that Company's decision in connection with the defense of any such claim, action or demand shall be final. For the avoidance of doubt, Artist is on notice and Company is hereby entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the Panda Dispute and all costs associated therewith

14. <u>Unique Services: Injunctive Relief</u>. Artist hereby acknowledges that Artist's services are of special, unique, unusual, extraordinary and intellectual character involving skill of the highest order which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action at law. Any breach, whether actual or threatened, of this Agreement with respect to such services would cause Company irreparable damage and harm. Company shall be entitled to seek injunctive and other equitable relief against Artist, in addition to whatever legal remedies are available to Company, to prevent or cure any such breach or threatened breach.

15. <u>Suspension: Termination</u>.

(a) If Artist's voice or ability to perform hereunder becomes materially impaired as determined by Company in its sole discretion, or if you or Artist fail, refuse, neglect or are unable to comply with any of your material obligations hereunder, then, in addition to any other rights or remedies which Company may have, Company shall have the right in its sole discretion, exercisable at any time by notice to Artist: (i) to terminate this Agreement without any further obligation to you except for payment of royalties, if Artist's account is 100% recouped and payable, or (ii) to extend the Term of this Agreement for the period of such default. Company's obligations hereunder shall be suspended for the duration of any such default.

(b) If because of: act of God; unavoidable accident; fire; lockout, strike or other labor dispute, riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of computer facilities; loss of books or records; or other cause of a similar or different nature not reasonably within Company's control, Company is unable to fulfill its obligations hereunder, then, without limiting Company's rights, Company shall have the option by giving you notice to suspend the Term of this Agreement for the duration of any such contingency and Company shall be excused of its obligations hereunder during such suspension, including its obligation to account and pay royalties. No such suspension shall exceed six (6) months.

16. <u>Waiver</u>. A waiver by Company of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.

17. <u>Breach</u>.

(a) The failure by any party to this Agreement to perform any of their respective obligations hereunder shall not be deemed a breach of this Agreement, unless within thirty (30) days after the non-breaching party learns of a breach or a threatened breach, said party serves written notice to the breaching party specifying the nature thereof, and the breaching party fails to correct such breach within thirty (30) days from receipt of the notice or in the event that the breaching party is not reasonably capable of correcting the breach within a thirty (30) day period, the breaching party does not commence to cure such breach within such thirty (30) day period.

(b) Notwithstanding the provisions of paragraph 17(a), in the case that Artist is required to perform any of their respective obligations hereunder or as agreed to by the parties and such respective obligations are scheduled in advance by Company for a specific date, time and/or place (i.e. Artist's scheduled travel, recording sessions, live shows and/or any and all personal appearances) and Artist fails to perform their obligation at any point up to and including the time and scheduled duration of such performance and/or personal appearance without Artist giving Company at least thirty (30) days prior notice, then at the sole discretion of Company, Artist shall upon Company's notice thereof be in immediate breach of the Agreement, as there is no adequate cure to compensate Company for any such breach in this regard. In the event that Company in its sole discretion agrees to permit Artist to cure such breach, such cure including without limitation Company's actual financial damages as a result of such breach by Artist as determined by Company in its sole discretion (the "Breach Damages") then Company shall additionally have the right in its sole discretion but without obligation to treat such Breach Damages as an Artist Advance under the Agreement. This provision shall not be applicable to the extent that the Artist's failure is due to natural disaster or a verifiable medical emergency requiring hospitalization and verified in writing by a licensed physician, that would prevent Artist from meeting their obligation as referenced herein.

18. <u>Independent Contractors</u>. It is understood and agreed that in entering into this Agreement, and in rendering services pursuant hereto, you have, and shall have; the status of an independent contractor and nothing herein contained shall contemplate or constitute you as Company's employee or agent.

19. <u>Complete Understanding; Entire Agreement</u>. This Agreement supersedes any and all prior negotiations, understandings, and agreements, both written and oral, between the parties hereto with respect to the subject matter hereof including without limitation superseding the Exclusive Recording Agreement executed between Artist and Company on or about February 22, 2018 (the "Prior Agreement"). Notwithstanding the forgoing, Artist also understands and acknowledges that Company is currently in good faith negotiations to resolve the Panda Dispute.  In the case that Company is successful in negotiating for and acquiring the rights in and to the alleged contractual Artist rights associated with the Panda Dispute (the "Panda Contract"), through assignment or otherwise, this Agreement shall also supersede the Panda Contract and all obligations, terms and conditions therein. This Agreement sets forth the complete understanding of the parties with regard to the subject matter contained herein. No modification shall be binding unless confirmed in writing and signed by both parties.

20. <u>Severability.</u> If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect.

21. Assignment.

(a) Company shall have the right, at Company's election and in its sole discretion, to assign this Agreement, and/or any or all of Company's rights and obligations hereunder, in whole or in part, to any other party. Any such assignee shall likewise have the right to assign this Agreement, in whole or in part. Company shall have the unlimited right to sublicense any of Company's rights hereunder. Artist may not assign this Agreement or any of your rights hereunder and any such purported assignment shall be void ab initio.

(b) Artist acknowledges that Company has the right to negotiate with third parties for the rights, in whole or in part, granted by you and Artist to Company herein. In the event that Company enters into any agreement(s) (specifically excluding any Distribution Agreement or publishing administration agreement) with any third party(ies) during any Contract Period (individually and collectively the "Third Party Agreement"), then the Term of this Agreement shall be deemed to be co-terminus with the term of any such Third Party Agreement.

(c) In the event that Company has substantially negotiated the material provisions (i.e. royalties, advances, term and product commitment) of a Third Party Agreement, but has not entered into such agreement upon the date when the final Contract Period would otherwise expire (the "Expiration Date"), then upon Company giving you written notice specifying the identity of the Third Party and the agreed upon material terms, the final Contract Period shall be extended for a period of ninety (90) days from the Expiration Date, Artist agrees to enter into a more formal, so called "long form" agreement and sign any personal inducement provisions that may be required from the third party.

(d) In the event Company enters into a Third Party Agreement during any Contract Period with respect to Company's rights under the Agreement in whole or in part, then the term of this Agreement with respect to such Company's rights in the Agreement in whole or in part shall be deemed to be co-terminus with the term of such Third Party Agreement with respect to the same rights in such Third Party Agreement as the same may be extended, renewed or suspended (including, but not limited to the Third Party's exercise of one (l) or more option periods ("Option Periods") pursuant to the Third Party Agreement plus a period of thirty (30) days.

(e) Notwithstanding anything to the contrary, Company shall be entitled to use any logo, trade name and/or trademark it so chooses in connection with you and/or any of your services in connection with the Entertainment Industry.

(f) In the event that Company enters into any Third Party Agreement that involves the payment of any financial advance(s) to Company, Company may keep the entire amount of such advance(s) for its own account with no obligation to Artist. Notwithstanding anything to the contrary and without any obligation, in the event that Company determines in its sole discretion to pay any portion of such Third Party Agreement advance(s) to Artist then such payments shall each be considered an Artist Advance.

22. Governing Law. This Agreement shall be deemed to have been made in the State of Florida, and its validity, construction, performance, and breach governed by the laws of the State of Florida applicable to agreements made and to be wholly-performed within. Any and all disputes arising under this Agreement shall be litigated exclusively in and before the courts within Miami-Dade County and the State of Florida and the parties hereby consent to the sole and exclusive jurisdiction before such courts.

23. <u>Notices</u>. All notices to be given to you hereunder shall be given to you in person or addressed to you at the physical address, email address, Instagram account and/or mobile/Text telephone number set forth below and all statements and payments to be sent to you hereunder shall be addressed to you at the physical address set forth below, or at such other physical address as you shall designate in writing from time to time. All notices to be given to Company hereunder shall be addressed to Company at Company's physical address set forth below, or at such other physical address as Company shall designate in writing from time to time:

Company:  PRIMO BOYZ RECORDS LLC          You:   ALEJANDRO MOSQUEDA
          Attn: Jose Polanco, President                Villa Carolina
          6508 Highland Avenue                         206-6 Calle 513
          Pennsauken, New Jersey 08110                 Carolina 00985-3022
                                                       Puerto Rico
                                                       Email: AlmightyCFM@gmail.com
                                                       IG: @almightygc
                                                       Mobile: 939-489-9916

All notices made by Artist shall be in writing and shall either be served by personal delivery (provided that a written receipt shall be obtained indicating that such delivery was made), certified mail - return receipt requested or by recognized commercial overnight mail carrier with receipt signature required, all charges prepaid. A courtesy copy of all notices by you to Company shall be sent to: PARRON LAW | Entertainment & Sports; 1360 Lugo Avenue, Coral Gables, Florida 33156, attn: Ivan Parron, Esq. and with an emailed copy to ip@PARRONLAW.com

All notices made by Company shall be in writing and shall either be served by personal delivery, certified mail - return receipt requested, recognized commercial overnight mail carrier, email, text message or social media message.

Notwithstanding the forgoing, Artist acknowledges and agrees that the mailing by certified or registered mail, return receipt requested, by commercial overnight carrier,  by email, by social media messaging account or by mobile text message to the last know addresses provided by Artist for any of the preceding methods of any process required by any court of law shall constitute valid and lawful service of process against them, without the necessity for service by any other means provided by law.

Except as otherwise provided herein, such notices shall be deemed given when personally delivered as expressed herein, mailed, emailed or transmitted, except that notices of change of address shall be effective only after the actual receipt thereof.

23.  <u>Legal Counsel</u>. THIS DOCUMENT CONTAINS IMPORTANT LEGAL TERMS AND RIGHTS THAT AFFECT YOU. YOU HEREBY ACKNOWLEDGE THAT COMPANY HAS ADVISED YOU TO SEEK INDEPENDENT LEGAL COUNSEL AND YOU HAVE SECURED OR HAVE HAD THE OPPORTUNITY TO SECURE LEGAL COUNSEL TO REPRESENT YOU IN CONNECTION WITH THIS AGREEMENT.

[THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

## II.    RECORDING

1. <u>Term</u>.

(a) The term of this Agreement (the "Term") shall consist of an initial contract period (the "Initial Contract Period"), plus four (4) separate, consecutive options (each an "Optional Contract Period") to extend the Term for a "Second," "Third," "Fourth" and "Fifth" contract period under the terms and conditions set forth hereinbelow (each contract period shall individually and collectively be referred to as "Contract Period"). The Initial Contract Period shall commence as of the date set forth in the initial paragraph on page 1 of this Agreement and shall continue until the date twelve (12) months after the initial U.S. commercial release of the First Album (as defined below) or unless otherwise terminated sooner by Company. Each Optional Contract Period shall commence upon expiration of the immediately preceding Contract Period and shall continue until twelve (12) months after the initial commercial release in the United States of the Album constituting the recording commitment for such Contract Period. Each Optional Contract Period shall be automatically exercised by Company unless Company gives you written notice to the contrary at any time prior to the expiration of the then current Contract Period.

(b) In the event that Company enters into a Distribution Agreement during any Contract Period, then the Term of that Contract Period shall be deemed to be co-terminus with the term of the Distribution Agreement with such Distributor. In the event that Company has substantially negotiated the material provisions (i.e. royalties, advances, term and product commitment) of a Distribution Agreement, but has not entered into such agreement upon the date when the then current Contract Period would otherwise expire (the "Expiration Date"), then the then current Contract Period shall be extended for a period of ninety (90) days from the Expiration Date. In the event Company enters into a Distribution Agreement during any Contract Period, then the term of that Contract Period shall be deemed to be co-terminus with the term of the Distribution Agreement as the same may be extended, renewed or suspended (including, but not limited to the Distributor's exercise of one (1) or more option periods ("Option Periods") pursuant to the Distribution Agreement) plus a period of thirty (30) days.

(c) Artist shall be subject to the same reduction, deductions, reserves, etc. that Company is subject to, as set forth in Company's agreement with said Independent Distributor.

2. <u>Delivery</u>.

(a) During each Contract Period, you shall perform exclusively for Company for the purpose of making phonograph records featuring your performances and embodying Compositions not theretofore recorded by you, and you shall record and deliver to Company Masters sufficient to constitute the type of phonograph record described in the tables below (the "Recording Commitment"). Company shall have the right and opportunity to have a representative attend each recording session.

| Period of the Term | Recording Commitment |
| --- | --- |
| Initial Period | One (l) Album ("First Album") |
| First Option Period | One (l) Album ("Second Album") |
| Second Option Period | One (l) Album ("Third Album") |
| Third Option Period | One (1) Album ("Fourth Album") |
| Fourth Option Period | One (1) Album ("Fifth Album") |

AMP

(b) During the Initial Period, Company shall have the exclusive and irrevocable right and option to require you to render your services in connection with recording up to eighteen (18) new Masters (the "First Album"). Notwithstanding the forgoing, Company hereby acknowledges the receipt of eighteen (18) new Masters by Artist comprising the Album currently titled "El Bestia" fulfilling Artist's Recording Commitment for the Initial Period.

(c) Notwithstanding the foregoing, and during the Initial Period and all subsequent exercised Option Periods, Company may, from time to time, require you to render your services in connection with the recording of additional Singles and/ or EPs (or so-called "Mixtapes") for the purposes of marketing and promoting your "brand" and increasing your fan base. Accordingly, in such instances, you agree that you shall not receive any additional advances nor will Company be obligated to pay you mechanical royalties pursuant to paragraph 7 herein if such additional Singles and/or EP's (or Mixtapes) are commercially exploited.

(d) You agree that you shall complete your Minimum Recording Commitment for each Contract Period within ninety (90) days following the commencement of such Contract Period.

(e) Subject to your prior professional commitments, you shall perform for Company for the purposes of making audiovisual recordings ("Music Video(s)") and shall, without limitation of your obligations as set forth elsewhere in this Agreement, comply with all terms and conditions relating thereto as may be set forth in any Distribution Agreement.

3. Recording Procedure.

(a) Company will pay for recording costs for each Master to be delivered by you hereunder. You will use good faith efforts to make technically and commercially satisfactory Masters. "Delivery" of a Master will occur only when you deliver to Company the Masters and all clearances, producer agreements, label exclusivity waivers, artwork and all other materials which Company needs to release an Album as determined in its own sole discretion, without any third-party claims and as otherwise in compliance with this Agreement.

(b) You shall not enter into any agreement on behalf of Company or incur, directly or indirectly, any liability or expense of any kind for which Company may be held liable, in connection with any recording session hereunder or otherwise, without having first obtained Company's prior written approval as to the nature, extent and limit thereof.

4. Assignment of Masters and Copyright. All Masters recorded by the Artist prior to and during the Term from the inception of recording thereof, and all Recorded Product manufactured therefrom, including without limitation the First, Second, Third, Fourth and Fifth Album, together with the performances embodied thereon and all out-takes thereof, shall be deemed a "work for hire" for Company and the sole property of Company throughout the universe, free from any claims whatsoever by Artist or any other person. The Company shall have the exclusive right to copyright such Masters in its name as the owner and author thereof and to secure any and all renewals and extensions of such copyrights. Such Masters together with all rights therein and in the performances embodied therein, shall otherwise be hereby deemed transferred to the Company by this Agreement.

5. <u>Ownership of Rights and Exclusivity.</u>

(a) Company owns, in perpetuity, all rights in the Masters and any other recordings made by you before and during the Term and delivered to Company, together with the performances on those recordings and copyrights in the recordings. Company also owns any artwork used in the packaging or exploitation of your records. For the purposes of this clause, you are our employee for hire. If for any reason, you are not considered our employee for hire, you hereby assign to Company all copyrights in the Masters and any other recordings made by you before the Term and delivered to Company for the life of such copyrights. Any grant to Company of copyrights includes any extensions and renewals of those copyrights.

(b) Company has the exclusive right to exploit and license or assign for exploitation the Masters delivered in connection with this Agreement or any derivatives thereof. Company can exploit the Masters in any manner in Records or any other medium or field of use, in the form delivered or otherwise. Company also has the exclusive right to use your Licensed Marks in connection with our exploitation of the Masters or as otherwise set forth in this Agreement.

6. <u>Recoupment</u>. Company has the right to recoup from your share of Company's Net Receipts one hundred percent (100%) of any advances paid to Artist and/or on Artist's behalf including without limitation Artist Advances and other recoupable costs, if applicable.

7. <u>Controlled Compositions.</u>

(a) Each composition embodied in a Master which is written or owned, in whole or in part, by you or any entity owned or controlled by you are referred to as a "Controlled Composition(s)." You hereby license to Company for the United States and Canada Controlled Compositions for a mechanical royalty equal to seventy-five percent (75%) of the Statutory Rate on a "first use" basis. The term "statutory rate" as used in this Agreement shall mean the minimum per-selection mechanical royalty rate under the United States Copyright Act as of the date you first deliver to Company a Master embodying such Controlled Composition with a cap of ten (10) x the Controlled Composition Rate in connection with any Album.

(b) If any compositions are recorded which are not Controlled Compositions, you warrant and represent that you shall procure and Company shall be granted mechanical licenses therefor for the United States at rates and on terms no less favorable to Company than those contained in the then-current standard license form then being utilized by the Harry Fox Agency, Inc.

(c) Company is hereby granted a royalty-free license to reproduce Controlled Compositions which are embodied on Masters produced hereunder in synchronization with and intime relation to visual images featuring Artist's performances in so-called "Music Videos" solely for promotional usage. Commercial usage shall be negotiated in good faith.

(d) Notwithstanding anything to the contrary contained herein, Company (or Company's designee) will pay mechanical royalties at the same rates, and on the same terms and conditions (including, without limitation, aggregate maximum limitations, number of units on which mechanical royalties are paid, reserves, etc.), as are contained in the mechanical royalty provisions of the applicable Distribution Agreement. You shall also comply with the other provisions of the "Controlled Composition" provisions of the Distribution Agreement (including, without limitation, those relating to the use of musical compositions in "Music Videos"). You shall not be required to grant mechanical licenses for USNRC Net Sales of full price Album at less than seventy-five (75%) percent of the minimum statutory license rate as of the date of recording of the applicable Master, subject to those provisions of the Distribution Agreement relating to mechanical royalty "caps" or "overages".

8. <u>Re-recording Restriction</u>.

(a) During the Term, you shall not perform or render any recording, producing, mixing or engineering services for the purpose of making Records or Masters for any person other than Company. After the expiration of the Term of this Agreement, you will not perform (for the purpose of making Records) any Controlled Composition which was recorded hereunder for any person other than Company until five (5) years after the date of delivery of the Master containing such Composition, or three (3) years after the expiration date of the Term of this Agreement, whichever is later.

(b) You shall not record, manufacture, distribute or sell, or authorize or knowingly permit your performances to be recorded by any party for any purpose without an express written agreement prohibiting the use of such Record in violation of any provision of this Agreement, including without limitation the restrictions in paragraph II 8.(a) above.

[THE REST OF THIS PAGE IS INTENTIONALLY BLANK]

### III.    MUSIC PUBLISHING

1. <u>Assignment of Copyrights</u>.

(a.) You hereby sell, transfer and assign to Company, and to Company's successor and its assign PRIMO BOYZ MUSIC PUBLISHING, LLC and/or its assigns, an undivided one hundred percent (100%) of your entire right, title and interest in and to all musical compositions written, owned, controlled and/or acquired by you and/or your wholly owned music publishing company LA INDUSTRIA DE LOS INMORTALES INC.("LIDLI"), in whole or in part, prior to the Term of the Agreement and/or during the Term of the Agreement, and/or which revert to you and/or LIDLI during the Term including but not limited to the Controlled Composition(s), (individually and collectively the "Compositions") including without limitation those listed in Schedule A hereto and also including without limitation, the copyrights therein and any and all renewals and/or extensions thereof throughout the Territory, in perpetuity and all claims and causes of action related to the Compositions accruing at any time and all other rights of whatsoever nature in the Compositions, including without limitation, the titles, words and music of the Compositions and each and every arrangement, adaptation and version thereof. Notwithstanding the forgoing, your failure to include or to accurately describe any Composition on Schedule A shall not diminish Company's s rights in and to such Old Composition. You and LIDLI shall execute and deliver to Company such instruments of transfer and other documents regarding the rights of Company in the Compositions as Company may reasonably request to carry out the purposes of this Agreement, (including, without limitation, the Exhibits and Schedules attached hereto), and Company may sign such documents in your name, LIDLI's name or the name of any songwriter you and/or LIDLI control and make appropriate disposition of them accordingly. Notwithstanding the foregoing, but subject to the next two sentences, Company shall use reasonably good faith efforts to give you and LIDLI five (5) days' notice to sign any such document before signing any document in your and LIDLI's name. Company may dispense with that waiting period only when necessary, in Company's reasonably good faith judgment, to protect or enforce Company's rights. Company shall not be required to notify you or LIDLI before signing short form assignments of rights granted in this Agreement for recordation with the United States Copyright Office or with any other copyright authority in the Territory. Upon your request, Company shall use reasonably good faith efforts to provide you with copies of any such agreement Company signs in your and LIDLI's name, but Company's non-repetitive failure to do so shall not constitute a breach hereof.

(b.) The Compositions shall, at Company's election, be registered for copyright by Company in your name and the name of Company and/or Company's assign PRIMO BOYZ MUSIC PUBLISHING LLC and/or its assigns in the Copyright Office. If any of the Compositions have heretofore been registered for copyright in your name or LIDLI's name, you and LIDLI shall simultaneously herewith deliver to Company an assignment of either a fifty percent (50%) interest of your interest therein when LIDLI has no interest in the subject Composition or an assignment of a one hundred percent (100%) interest of LIDLI's interest therein if LIDLI has an interest in the subject Composition. If the Compositions have not heretofore been registered for copyright in your name or LIDLI's name, you and LIDLI  shall promptly deliver to Company an assignment, to the extent of its interest therein, of a one-half (1/2) interest therein to Company and a one-half (1/2) interest therein to you. A copy of such assignments is attached hereto as <u>Exhibit "A"</u> and made a part hereof. You shall execute and deliver to Company such instruments of transfer and other documents regarding the rights of Artist and/or LIDLI in the Compositions as Company may reasonably request to carry out the purposes of this Agreement (including, without limitation, the Exhibits annexed hereto), and with respect to each document that you and/or LIDLI have failed to sign and return to Company within ten (10) days after Company has submitted that document to you, Company may sign that document in your name and/or LIDLI's name and make appropriate disposition of that document.

(c) In the event that you affiliate with a performing rights society other than BMI, Company's affiliated company, which is a member of the applicable society, shall automatically become a party to this Agreement and the ownership of all Compositions shall be with Company's publishing company affiliated with such society.

2. <u>Administration</u>. Company and its assign PRIMO BOYZ MUSIC PUBLISHING LLC and/or its assigns Licensees shall administer one hundred percent (100%) of your share in the Compositions and have the sole and exclusive right in perpetuity, throughout the Territory, to:

(a) License and cause other Persons to license the exploitation of the Controlled Compositions, including, without limitation, the right to license broadcast and other public performances, sound synchronization in audiovisual works, and the right to license the manufacture, distribution and sale of phonograph records embodying any one (1) or more of the Controlled Compositions;

(b) Administer and grant any and all rights in the Compositions and the copyrights therein;

(c) Print, publish and sell printed editions of the Compositions;

(d) Collect all monies payable, with respect to the Controlled Compositions, in addition to all monies due prior to the date hereof, and all performance royalties payable to you with respect to the Compositions by the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), Society of European Stage Authors and Composers (SESAC), or any other applicable performing rights society (collectively the "Societies"), but excluding any "songwriter's share" of public performance income. If a Society in any country of the Territory does not license any particular public performance use of a Composition, it is understood Company may license that use directly and all income received by Company in connection with such licenses shall be deemed gross income;

(e) Make arrangements, translations, or otherwise adapt or change any one (l) or more of the Controlled Compositions in any manner;

(f) Otherwise administer the Controlled Compositions and the copyrights therein and to act as the Company thereof and exercise all of such rights as fully as if the copyrights were registered in Company's name alone and as if Company alone were the sole and exclusive owner thereof.


[THE REST OF THIS PAGE IS INTENTIONALLY BLANK]

### IV.     CONCERTS; TOURS

You hereby grant, for the Term plus twelve (12) months following delivery of the last Album hereunder and in the Territory, to Company and/or its assigns and licensees the following exclusive rights to: (a) promote your live performances, including but not limited to concerts and tours; (b) identify Company as the exclusive promoter thereof; (c) selloff your live performances to a third party local promoter; (d) to use your Licensed Marks in connection with the performances, concerts, tours, tour website, including the advertising and promotion thereof; (e) secure sponsorship agreements granting sponsorship rights in connection with your performances, concerts and tours, including "tie-ins" where services or products are given in lieu or in addition to monetary consideration, provided that each sponsorship agreement is subject to your prior approval (which shall not be unreasonably withheld); (f) license and otherwise authorize third parties to make radio and/or Internet broadcasts of your performances and concerts; (g) secure agreements for the filming of your performances and concerts; and (h) synchronize and publicly perform Compositions in the advertisements of your performances, concerts and the tours and tour website.

### V.     MERCHANDISING

During the Term plus twelve (12) months following delivery of the last Album hereunder, you hereby grant to Company and/or its assigns and licensees the sole and exclusive perpetual worldwide right and license (with such right and license continuing on a non-exclusive basis after such twelve (12) month period) to utilize the Licensed Marks in connection with the manufacture, distribution, sale and promotion of merchandise through any and all manners and channels of distribution whatsoever, including in and about the venue and area of a performance and through your fan clubs and the sole and exclusive right and license to establish and to utilize the Licensed Marks in connection with your website. You hereby grant Company the unrestricted right to sublicense to any third party the manufacture, distribution, supply, and promotion of merchandise hereunder, in whole or in part and the right to enter into joint distribution arrangements with third parties for the distribution of merchandise. Company shall submit to you, for your approval, a deal memo detailing the specifics of each such proposed license or advertisement. You shall, within five (5) days following receipt by you of each proposed deal memo, advise Company as to whether such proposed deal memo is accepted or rejected. Your approval shall be deemed given in the event that you shall fail to submit objections in accordance with the foregoing sentence.

### VI.     SPONSORSHIPS AND ENDORSEMENTS

You hereby grant to Company and/or its assigns and licensees the exclusive right during the Term hereof and in the Territory to: (i) enter into agreements for premiums, give-aways, promotional tie-ins concerning you or your Licensed Marks; (ii) enter into endorsement and sponsorship agreements on your behalf with respect to any product category. Company shall submit to you, for your approval (which may be withheld for any reason), a deal memo detailing the specifics of each such proposed agreement. You shall, within five (5) days following your receipt of each proposed deal memo, advise Company as to whether such proposed deal memo is accepted or rejected. Your approval shall be deemed given in the event that you shall fail to submit objections in accordance with the foregoing sentence.


[THE REST OF THIS PAGE IS INTENTIONALLY BLANK]

## VII.   MANAGEMENT

1. You hereby engage Company on an exclusive basis during the Term and throughout the universe, to represent you as your Personal Manager in connection with all of your services, activities and undertakings throughout the Entertainment Industries.

2. You and Company agree that all monies shall be remitted directly to Company. You hereby irrevocably authorize and direct any payors of Gross Receipts earned by you pursuant to any agreements in the Entertainment Industries (and you shall further direct and authorize such parties (via an irrevocable Letter of Direction) to the extent necessary or requested by Company) to render statements and payments directly to Company at the same times as the monies are payable to you. In the event that any payor fails or refuses to pay Company directly, you shall pay Company such Gross Receipts within five (5) days of your receipt thereof. You agree to furnish Company with a true and complete copy of agreements that you have entered into promptly following Company's request therefor.

3. During the Term, Company is irrevocably authorized by you to act on your behalf as your attorney-in-fact to do all the following:

     (a) approve and permit the use of your names, photographs, likenesses, voices, sound effects, caricatures and literary, artistic and musical materials for purposes of advertising and publicity;

     (b) execute for you in your name and/or on your behalf any and all agreements when you are not immediately available, documents and contracts for your services, talents and/or artistic, literary and musical materials, and exercise, on your behalf, any rights to examine and/or audit books and records in connection therewith; and

     (c) after consultation with you, engage as well as discharge and/or direct for you, and in your name, managers, booking agents, public relations firms and lawyers as well as other persons, firms and corporations who may be retained in connection with your affairs in the Entertainment Industries.

4. Notwithstanding anything to the contrary contained herein, in the event that you nevertheless receive such monies directly from third-parties, you shall be deemed to hold the entire amount in trust for Company and promptly pay, wire and/or transfer the entire amount to Company as per Company's instructions unless mutually agreed to otherwise by the parties.

5. <u>Conflicts of Interest</u>. You hereby acknowledge that Jose Polanco is the principal owner of Company and that your consent herein, has been given freely and voluntarily by you, and that you have had the opportunity to consult with independent counsel of your own choice prior to executing this Agreement and have fully considered the conflicting interests that exist or may arise prior to your giving your consent; Company's recording, music publishing, concerts/tours, merchandising, sponsorships and endorsements and management activities shall not constitute or be deemed to constitute a breach of this Agreement or of Company's fiduciary obligations to you pursuant to this Section VII and shall not in any way affect Company's right to compensation in connection with management services provided by Company hereunder. In conformity herewith, you state, covenant and otherwise acknowledge and agree that any negotiations or re-negotiations regarding the material terms of this Agreement shall be conducted by your own independent attorney and legal counsel of choice unless you alternatively chose to waive such right in your sole discretion. Accordingly, you hereby state, warrant and otherwise agree to release, withhold, forbear and waive any claims based in part or wholly upon either actual or the appearance of any conflicts of interests which may or may not arise as a result of the foregoing.

6. <u>Offers of Employment</u>. You shall immediately advise Company of all offers of employment, and all inquiries concerning your career in the Entertainment Industries, so that Company may determine and advise you whether same are compatible with your career.

7. <u>Not A Talent Agent</u>. You and Company hereby acknowledge and agree that Company is not an employment agent, theatrical agent, or licensed artist's manager, and that Company has not promised to procure employment or engagements for you and that Company shall not be obligated to procure or to attempt to procure any employment or engagements for you hereunder.

[THE REST OF THIS PAGE IS INTENTIONALLY BLANK]

## VIII.  DEFINITIONS.

As used in this Agreement, the following terms will have the following meanings:

1. "<u>Artist Advances</u>" means any prepayment made by Company (or in Company's behalf) in Company's sole discretion and without any obligation, to you or on your behalf, of Company's Net Receipts. Artist Advances shall include all monies paid by Company to you or on your behalf including without limitation to rent, lease or purchase clothing, shoes, jewelry, real estate, automobiles, vacations, artwork and/or any other tangible or non-tangible assets. Company may recoup 100% of all Artist Advances from your share of Company's Net Receipts to be paid or accrued to or on behalf of you pursuant to this Agreement. For the avoidance of doubt, Artist acknowledges and agrees that to date Company has paid Artist Advances totaling the sum amount of One Hundred Ten Thousand Dollars ($110,000.00) including 80,000.00 in jewelry, 30,000.00 towards the purchase of a home by Artist and in addition, any amount to be paid by Company to settle the Panda Dispute.

2. "Album" means a Record embodying no less than eighteen (18) Masters, containing no less than seventy (70) minutes of playing time. Company and You shall mutually approve all creative decisions in relation to the Album, your marketing and/or branding; however, in the event that Company and You disagree, Company shall have full and final discretion over any creative and/or marketing matter.

3. "Entertainment Industries" shall include, without limitation:(a) personal appearances (whether or not before an audience and whether or not live and/or recorded for exhibition or broadcast, including tours) ("Touring Activities"); (b) exploitation of Artist's name(s) and Artist's likenesses by merchandising, sponsorship, endorsement or any other advertising or promotional means in any and all media and mediums (including without limitation via the Internet and social media) now know or hereinafter created throughout the universe; (c) appearing in television programs, videos, films or in live theater productions as artists or as actors; (d) the composing, writing and publishing of musical compositions and lyrics; (e) the writing of literary or dramatic works (that are not musical compositions) including, without limitation, fictional and non-fictional works, poems, newspaper, magazine and other press articles and manuscripts (including, without limitation, television and film scripts and screenplays); and (f) the exploitation, transmission or distribution of Master recordings and/or records embodying Artist's performances by persons other than Company, its affiliate/principal licensees and any of their respective licensees pursuant to the terms of this agreement.

4. "Gross receipts" shall mean all non-refundable monies actually collected by Company in connection with this Agreement.

5. "Company's Net Receipts" shall mean Gross Receipts less any and all deductions, costs and expenses incurred in connection with this Agreement and/or on behalf of Artist (exclusive of Artist Advances) which shall all be 100% fully recoupable by Company, including but not limited to: advances or deposits from third parties which are subject to refund until earned; Recording Budget; Marketing Fund; Recording Costs; Record artwork; music video costs, distribution costs, independent promotion costs; all costs incurred by Company in connection with the manufacture, distribution, development, sale, advertising, protection of rights and collection of money associated with Masters, Licensed Marks and merchandise; all costs incurred by Company to develop and maintain your "Official" websites and/or social media sites; trademark application costs, reasonable attorneys' fees actually incurred, costs of goods sold; costs and expenses of the prosecution, defense or settlement of claims or suits related to Artist including without limitation those pursuant to Artist's services rendered hereunder (but specifically excluding costs and expenses of the

prosecution, defense or settlement of claims or suits related to the Panda Dispute which shall be considered Artist Advances); insurance payments; hall fees; security fees; freight, shipping and handling; road personnel salaries; lodging and transportation; returns; trade discounts, mark-downs, chargebacks; sales taxes; commissions payable by Company to third parties including collection agents, and marketing and advertising expenses. For purposes of clarification, no Gross Receipts shall be earned with respect to merchandise furnished on a "no-charge" basis, for promotional, marketing, or goodwill purposes, or for discontinued or distress sales of merchandise at or below manufacturing costs, or for promotional sales (for example, sales to you).

6. "Licensed Marks" shall mean: your names, symbols, logos, trademarks, service marks, designs, copyrights, signatures, publicity rights, likenesses and/or images or the individual members of the group (if applicable) or in any other capacity.

7. "Master" or "Masters" means all recordings made by or acquired by you, in whole or in part, prior to the Term of the Agreement and/or during the Term of the Agreement and/or which revert to you during the Term of the Agreement.

8. "Panda Dispute" means the lawsuit filed by Panda Entertainment against Artist in Puerto Rico prior to the date hereof.

9. "Recording" means a recording of sound, without or with visual images, which is used or useful in the recording, production or manufacture of records.

10. "Record" means all forms of reproductions, whether embodying sound alone or sound together with visual images, manufactured or distributed primarily for home use.

11. "Recording Costs" include, without limitation, producer advances and fees, tape costs, studio costs, session fees, mastering costs, equipment rental, travel costs, legal fees and other costs incurred in connection with the recording of the Masters.

8. "Social Media"- Social media accounts, networks, platforms and channels including without limitation Facebook, Instagram, Twitter, YouTube, SnapChat and all other currently existing and future developed social media platforms.

12. "Distributor"- a record company or other entity which (i) is a parent or subsidiary of or, is affiliated with, one of the major "branch" distributors in the United States (e.g. including without limitation, presently SONY, WEA and UMVD) ("Major Label Distributor") or; (ii) which is a parent, subsidiary or affiliate of one of the major "independent" distributors in the United States (i.e. InGrooves, Select-O-Hits, Empire) ("Independent Distributor"); or (iii) whose records are distributed by any such record company which shall have the right to distribute in the United States phonograph records derived from the Master Recordings recorded hereunder pursuant to a Distribution Agreement. Major Label Distributor and Independent Distributor shall be collectively referred to as "Distributor".

13. "Distribution Agreement"- an agreement pursuant to which Company grants to Distributor and/or any other third party the right to distribute through normal retail channels in the United States, phonograph records derived from the Masters recorded hereunder.

[SIGNATURES ON FOLLOWING PAGE]

Please confirm your agreement with the foregoing by arranging for signatures where indicated below. This agreement may be executed in counterparts, and facsimile, digital signatures and photocopied signatures of this agreement shall be treated as originals for all purposes relating to this Agreement.

AGREED AND ACCEPTED        .

Company:                                                    Artist:

PRIMO BOYZ RECORDS LLC

*Jose Polanco*

By: Jose polanco (Jun 20, 2019)                            Alejandro Mosqueda (Jun 19, 2019)

Jose polanco                                               CARLOS LEANDRO MOSQUEDA PAZ
                                                          a/k/a ALEJANDRO MOSQUEDA p/k/a "ALMIGHTY"

President                                                  SS# ████████

Jun 20, 2019                                               Jun 19, 2019

## COMPOSITIONS
## SCHEDULE A

to an agreement between CARLOS LEANDRO MOSQUEDA PAZ a/k/a ALEJANDRO MOSQUEDA p/k/a "ALMIGHTY" (hereinafter "Artist"), on the one hand, and PRIMO BOYZ RECORDS LLC, (hereinafter "Company"), on the other hand, dated as of March 15, 2019

---

(References include paragraph III)

Compositions

| Title | Writer(s) | Writer Splits | Publisher(s) | Publisher Splits | U.S. Copyright Registration No./Date |
|---|---|---|---|---|---|
| 1.  ABUSADORA | | | | | |
| 2.  DE BICHOTE | | | | | |
| 3.  EN EL CARRO | | | | | |
| 4.  ERROR | | | | | |
| 5.  FLUYE | | | | | |
| 6.  LEY DE VIDA | | | | | |
| 7.  LOCA | | | | | |
| 8.  MIENTRAS YO ESTE AQUÍ | | | | | |
| 9.  OSCAR DE LA HOYA | | | | | |
| 10. PODER Y PAUTA | | | | | |
| 11. SANTA CLAUSE | | | | | |
| 12. SIEMPRE ESTA CONMIGO | | | | | |
| 13. SIEMPRE ESTA CONMIGO REMIX | | | | | |
| 14. TAMBOR | | | | | |
| 15. TBT | | | | | |
| 16. TU PELÍCULA | | | | | |
| 17. LOCATION | | | | | |
| 18. ASTRONAUTO | | | | | |
| 19. DIOSA | | | | | |
| 20. FUCK THE POLICE | | | | | |
| 21. INDIFERENTE | | | | | |
| 22. LOKO | | | | | |
| 23. TU NO TIENES | | | | | |
| 24. VACIO | | | | | |
| 25. AMARRATE LAS TIMBER | | | | | |
| 26. ASALTO | | | | | |
| 27. COSTEAR | | | | | |
| 28. COSTEAR EQUIPO ROJO | | | | | |
| 29. COSTEAR REMIX EQUIPO NEGRO | | | | | |
| 30. COSTEAR REMIX EQUIPO ROJO | | | | | |
| 31. CRECÍA | | | | | |
| 32. ESCAPATE CONMIGO REMIX | | | | | |
| 33. HATERS REMIX | | | | | |
| 34. OJALA | | | | | |
| 35. PERSONALIDA | | | | | |
| 36. PRAYER | | | | | |
| 37. QUIERE FUMAR REMIX | | | | | |
| 38. SE QUE QUIERES REMIX | | | | | |
| 39. SOLITA | | | | | |
| 40. TE REGALARE MUCHOS BESOS FEAT ALMIGHTY | | | | | |
| 41. TU ME ENAMORASTES REMIX | | | | | |

*[to be completed by Songwriter(s)]*



AMP

## ASSIGNMENT
## EXHIBIT A

to an agreement between CARLOS LEANDRO MOSQUEDA PAZ a/k/a ALEJANDRO MOSQUEDA p/k/a "ALMIGHTY" (hereinafter "Artist"), on the one hand, and PRIMO BOYZ RECORDS LLC, (hereinafter "Company"), on the other hand, dated as of March 15, 2019

---

(References include paragraph III 1. (b))

The undersigned ("Assignor"), for good and valuable consideration, receipt of which is hereby acknowledged, hereby sells, conveys and assigns in equal shares to PRIMO BOYZ MUSIC PUBLISHING LLC (BMI) ("Assignee"), their successors and assigns, an undivided fifty percent (50%) interest in Assignor's entire right, title and interest throughout the world and universe, in and to the musical compositions subject to the agreement between Assignor and Assignee dated March 15, 2019 to which this assignment is attached, including without limitation, the songs listed on the attached Schedule A, as well as the copyrights and any other rights now known or which may hereafter be recognized or come into existence relating to those musical compositions, and any and all renewals and extensions of such copyrights and other rights under applicable laws, treaties, regulations and directives now or hereafter enacted or in effect.

IN WITNESS WHEREOF, Assignor has executed this instrument on __Jun 19, 2019__, 2019

_____
Alejandro Mosqueda (Jun 19, 2019)
_____
ALEJANDRO MOSQUEDA, Individually

<u>ACKNOWLEDGMENT</u>

[IF ACKNOWLEDGED IN NEW YORK STATE]

STATE OF _____)
                                                  ) ss:
COUNTY OF _____)


On _____, before me, the undersigned, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual executed the instrument.


Sworn to before me
this _____ day of _____


_____
Notary Public



[IF ACKNOWLEDGED OUTSIDE NEW YORK STATE]

STATE OF _____)
                                                  ) ss:
COUNTY OF _____)

On _____, before me, the undersigned, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual executed the instrument, and that such individual made such appearance before the undersigned in _____ [insert the city or other political subdivision and the state or county or other place the acknowledgement was taken].

Sworn to before me
this _____ day of _____


_____
Notary Public

**ASSIGNMENT**
**EXHIBIT A (Cont)**

to an agreement between CARLOS LEANDRO MOSQUEDA PAZ a/k/a ALEJANDRO MOSQUEDA p/k/a "ALMIGHTY" (hereinafter "Artist"), on the one hand, and PRIMO BOYZ RECORDS LLC, (hereinafter "Company"), on the other hand, dated as of March 15, 2019

---

(References include paragraph III 1. (b))

The undersigned ("Assignor"), for good and valuable consideration, receipt of which is hereby acknowledged, hereby sells, conveys and assigns in equal shares to PRIMO BOYZ MUSIC PUBLISHING LLC (BMI) ("Assignee"), their successors and assigns, an undivided one hundred percent (100%) interest in Assignor's entire right, title and interest throughout the world and universe, in and to the musical compositions subject to the agreement between Assignor and Assignee dated March 15, 2019 to which this assignment is attached, including without limitation, the songs listed on the attached Schedule A, as well as the copyrights and any other rights now known or which may hereafter be recognized or come into existence relating to those musical compositions, and any and all renewals and extensions of such copyrights and other rights under applicable laws, treaties, regulations and directives now or hereafter enacted or in effect.

IN WITNESS WHEREOF, Assignor has executed this instrument on ___Jun 19, 2019___, 2019

LA INDUSTRIA DE LOS INMORTALES, INC.

_Alejandro Mosqueda (Jun 19, 2019)_

By:  Alejandro Mosqueda

Its:  President

<u>ACKNOWLEDGMENT</u>

[IF ACKNOWLEDGED IN NEW YORK STATE]

STATE OF _____)
                               ) ss:
COUNTY OF _____)

      On _____, before me, the undersigned, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual executed the instrument.

Sworn to before me
this _____ day of _____

_____
Notary Public

[IF ACKNOWLEDGED OUTSIDE NEW YORK STATE]

STATE OF _____)
                               ) ss:
COUNTY OF _____)

      On _____, before me, the undersigned, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual executed the instrument, and that such individual made such appearance before the undersigned in _____ [insert the city or other political subdivision and the state or county or other place the acknowledgement was taken].

Sworn to before me
this _____ day of _____

_____
Notary Public

## EXHIBIT B

to an agreement between CARLOS LEANDRO MOSQUEDA PAZ a/k/a ALEJANDRO MOSQUEDA p/k/a "ALMIGHTY" (hereinafter "Artist"), on the one hand, and PRIMO BOYZ RECORDS LLC, (hereinafter "Company"), on the other hand, dated as of March 15, 2019

---

(References include paragraph III 2.)

To:    ALL RECORD MANUFACTURERS    To:    ASCAP/BMI
       LICENSED TO MECHANICALLY
       REPRODUCE COMPOSITIONS       To:    HARRY FOX AGENCY
       SPECIFIED HEREINBELOW

To:    ALL OTHER PARTIES IN INTEREST

Please be advised that effective as of March 15, 2019, I hereby grant to PRIMO BOYZ MUSIC PUBLISHING LLC, and its licensees, affiliates and assignees, the sole and exclusive right throughout the universe to administer all musical compositions ("Compositions") (and the copyrights therein), that are subject to the agreement ("Agreement") dated as of March 15, 2019, between the undersigned, on the one hand, and PRIMO BOYZ RECORDS LLC, on the other hand, including but not limited to:

(i)     license and cause others to license the use of the Compositions;

(ii)    administer and grant rights in and to the Compositions and the copyrights therein;

(iii)   publish and sell sheet music and/or folios of the Compositions if it so elects;

(iv)    collect all monies payable with respect to the Compositions, including monies earned but not paid prior to the effective date hereof; and

(v)     otherwise administer the Compositions and the copyrights therein and to act as the publishers thereof.

We expressly authorize and direct you to pay all such royalties and other sums which are or may become payable to us pursuant to the Agreement to:

PRIMO BOYZ MUSIC PUBLISHING LLC
6508 Highland Ave
Pennsauken, NJ 08110

**Important**:  all payments must be paid solely in the name, or credited to the account, of PRIMO BOYZ MUSIC PUBLISHING LLC.

*amp*
Alejandro Mosqueda (Jun 19, 2019)
_____
ALEJANDRO MOSQUEDA

## **EXHIBIT C**

to an agreement between CARLOS LEANDRO MOSQUEDA PAZ a/k/a ALEJANDRO MOSQUEDA p/k/a "ALMIGHTY" (hereinafter "Artist"), on the one hand, and PRIMO BOYZ RECORDS LLC, (hereinafter "Company"), on the other hand, dated as of March 15, 2019

---

(References include paragraph III 2.)

BMI
7 World Trade Center
250 Greenwich Street
New York, NY 10007-0030

Dear Sir/Madam:

Please be advised that I, the undersigned, have entered into an agreement with PRIMO BOYZ MUSIC PUBLISHING LLC ("Publisher") dated as of March 15, 2019 (the "Agreement") pursuant to which Publisher has the sole and exclusive right to administer all copyrights owned or controlled by me, including, without limitation, the copyrights that are subject to the agreement between you and me. Publisher will have the sole and exclusive right as of the date of the Agreement to collect and receive all royalties and other sums payable in respect of the so-called "publisher's share" of income which are or may become payable to me pursuant to my agreement with you.

I hereby authorize and direct you to pay all such royalties and other sums which are or may become payable to me on and after the date of this letter directly to Publisher as follows:

PRIMO BOYZ MUSIC PUBLISHING LLC
6508 Highland Ave
Pennsauken, NJ 08110

This letter of direction may not be revoked, modified or terminated except by a written instrument signed by Publisher and me.

Very truly yours,

_Alejandro Mosqueda (Jun 19, 2019)_
_____
ALEJANDRO MOSQUEDA, Individually