**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
MIAMI DIVISION

| | | |
|---|---|---|
| ALEJANDRO MOSQUEDA PAZ, a/k/a "ALMIGHTY," | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No.: 25-cv-22652-KMW |
| PRIMO BOYZ RECORDS LLC a/k/a PRIMO BOYZ RE L.L.C., PRIMO BOYZ MUSIC PUBLISHING L.L.C., and JOSÉ POLANCO | ) ) ) ) ) | |
| Defendants. | ) ) | |
| PRIMO BOYZ RECORDS LLC | ) ) | |
| Counter-Plaintiff and Third-Party Plaintiff | ) ) ) ) | |
| v. | ) ) | |
| ALEJANDRO MOSQUEDA PAZ p/k/a 1 "ALMIGHTY", LA FUNDA MUSIC LLC, GEOVANNI BRUQUE ALBUJA, and BRANDON DAVID ROCHA | ) ) ) ) ) | |
| Defendants. | ) ) | |

_____/

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Defendant, PRIMO BOYZ RECORDS LLC A/K/A PRIMO BOYZ RE L.L.C ("Primo Boyz Records" or "Defendant"), by and through undersigned counsel, brings this Counterclaim and Third-Party Complaint against ALEJANDRO MOSQUEDA PAZ p/k/a 1 "ALMIGHTY" ("Plaintiff" or "Counter-Defendant" or "Almighty"), LA FUNDA MUSIC LLC ("La Funda"), GEOVANNI BRUQUE ALBUJA ("Albuja"), and BRANDON DAVID ROCHA ("Rocha") and allege as follows:

**JURISDICTION AND VENUE**

1)     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), as the parties are citizens of different states and the amount in controversy exceeds $75,000.

2)     Venue is proper for the Counterclaims against Plaintiff in this district under 28 U.S.C. § 1391(b) and pursuant to the venue clause in the parties' agreement authorizing suit to be filed "in and before the courts within Miami- Dade County and the State of Florida."

3)     Venue is proper for the Third-Party Claim against La Funda in this district under 28 U.S.C. § 1391(b) and pursuant to the venue clause in the Assignment Agreement with La Funda authorizing suit to be filed in "the local, district and Federal courts located in Miami Dade County, Florida."

4)     Venue is proper under 28 U.S.C. § 1391(b) for the Third-Party Claims against Albuja and Rocha because the Multiple Rights Agreement at issue in this litigation indicates that it is governed by Florida law and that Venue is proper "in and before the courts within Miami- Dade County and the State of Florida."

5)     Jurisdiction and Venue are also proper before this Court because the Counterclaims and Third-Party Claims arise out of and relate to the Complaint pending before this Court in the above captioned litigation.

**PARTIES**

6)     ALEJANDRO MOSQUEDA PAZ p/k/a 1 "ALMIGHTY" ("Plaintiff" or "Counter-Defendant" or "Almighty") is a Puerto Rican citizen and a party to the Multiple Rights Agreement at issue in this litigation.  Almighty commenced the above captioned litigation by filing a Complaint in this Court on June 11, 2025 [ECF 1].  A copy of the Multiple Rights Agreement is attached to the aforementioned Complaint as Exhibit 1 [ECF 1-1] and incorporated herein as if it were attached as an Exhibit to this Counterclaim and Third-Party Claim.

7)   LA FUNDA MUSIC LLC ("La Funda"), is a Florida limited liability company and is a party to an Assignment Agreement dated April 17, 2025 between La Funda and Primo Boyz Records relating to the Multiple Rights Agreement between Primo Boyz Records and Plaintiff.  A copy of the Assignment Agreement has been made available to Plaintiff Almighty and is also in the possession of La Funda, but is not attached hereto due to confidentiality requirements contained within said Assignment Agreement.  A copy of the full Assignment Agreement shall be filed separately under seal in this litigation.

8)   GEOVANNI BRUQUE ALBUJA ("Albuja") is, on information and belief, a citizen of Ecuador who has conducted business in the United States in, *inter alia*, Miami-Dade County, Florida related to Plaintiff Almighty.  Albuja tortuously interfered with the Multiple Rights Agreement [ECF 1-1] at issue in this litigation resulting in injury to Primo Boyz Records.

9)   BRANDON DAVID ROCHA ("Rocha") is, on information and belief, a citizen of Colombia who conducts business in the United States in, *inter alia*, Miami-Dade County, Florida related to Plaintiff Almighty.  Rocha tortuously interfered with the Multiple Rights Agreement [ECF 1-1] at issue in this litigation resulting in injury to Primo Boyz Records.

10)  PRIMO BOYZ RECORDS LLC ("Primo Boyz Records" or "Defendant") is a New Jersey Limited Liability Company.  Primo Boyz Records is a party to the Multiple Rights Agreement [ECF 1-1] at issue in this litigation and is also a party to the Assignment Agreement with La Funda.  Primo Boyz Records is also a Defendant in the litigation filed by Plaintiff in this litigation [ECF 1].

## FACTUAL ALLEGATION COMMON TO ALL CAUSES OF ACTION

### I.   THE MULTIPLE RIGHTS AGREEMENT

11)  Plaintiff Almighty and Defendant Primo Boyz Records entered into a "Multiple Rights Agreement" [ECF 1-1] dated March 15, 2019.

12)   The Multiple Rights Agreement (hereinafter the "MRA") was executed by the parties on June 19, 2019 and June 20, 2019, respectively [*see* ECF 1-1].

13)   The MRA created a valid beneficial contractual relationship between Plaintiff Almighty and Defendant Primo Boyz Records.

14)   The MRA recited that:

WHEREAS, Company is desirous of engaging Artist's personal services in connection with the Entertainment Industries;

WHEREAS, Artist deems it is in its best interest to enter into this Agreement and Artist shall provide such personal services on an exclusive basis upon the terms and conditions set forth herein;

*See* MRA [ECF 1-1] at p. 1.

15)   The MRA also set forth the "Scope of [Primo Boyz Records'] Activities" in Section I.5 thereof:

5. Scope of Company's Activities. Company agrees to provide the following services in accordance with Sections II – VII of this Agreement:

(a) Section II; Recording: fund and record new original Masters featuring Artist's performances for marketing and distribution at Company's sole discretion;

(b) Section III; Music Publishing: exploit the copyrights in and to all Compositions owned or controlled by you or Artist in accordance with the terms of this Agreement;

(c) Section IV; Tours, Concerts: promote your live performances;

(d) Section V; Merchandising: use and authorize or sublicense others to use your and Artist's Licensed Marks for commercial purposes;

(e) Section VI; Sponsorships and Endorsements: Company shall enter into sponsorship and endorsement agreements as set forth herein; and

(f) Section VII; Management: advise, guide and counsel Artist in the development and furtherance of Artist's career in the Entertainment Industries.

*See* MRA [ECF 1-1] at Section I.5.

16)   The MRA also set forth the "Engagement [of Plaintiff Almighty]" in Section I.6 thereof:

6. Engagement.
    (a) During the Term of this Agreement, except as otherwise provided herein, Company hereby engages Artist and Artist hereby agree to provide the following exclusive personal services:
        (i) Record and perform as an artist and producer for the purpose of making Master Recordings for Company as set forth in Section II of this Agreement;
        (ii) Perform as a songwriter and composer as set forth in Section III of this Agreement;
        (iii) Perform as a professional vocalist and performing artist in connection with live performances and concerts as set forth in Section IV of this Agreement; and

    (b) In addition to the exclusive personal services provided in paragraph I.6(a)(i)-(iii), you hereby grant to Company the exclusive right to:
        (i) use and authorize or sublicense others to use your or Artist's Licensed Marks;
        (ii) act as Artist's authorized representative to negotiate the terms of exploitation of your Licensed Marks in connection with products and services;
        (iii) act as Artist's exclusive personal manager in the absence of a personal manager to be selected solely by mutual approval of Artist and Company as otherwise set forth in this Agreement; and
        (iv) delay or refrain, at Company's election and in its sole discretion, from doing any one (l) or more of the foregoing in paragraph I.6(a)(i)-(iii) and paragraph I.6(b)(i)-(iii) in whole or in part.

*See* MRA [ECF 1-1] at Section I.6.

17)   The MRA also provided for the payment of "Consideration" that set forth the percentages of "Net Receipts," as that term was defined in the MRA, to be apportioned between Plaintiff Almighty and Defendant Primo Boyz Records generally as follows:

7. Consideration.
    (a) In consideration for the services to be rendered and rights granted by you hereunder, Company shall pay to you the following percentages of Company's Net Receipts (as defined below in Section VIII, paragraph 4):

| Services | Your Share |
|---|---|
| Recording | 50% of Net Receipts |
| Music Publishing[1] | 50% of Net Receipts |
|     Publisher's share of public performance | 50% of Net Receipts |
|     All other exploitation | 50% of Net Receipts |
| Tours; Concerts, Personal Appearances | 70% of Net Receipts |
| Merchandising | 50% of Net Receipts |
| Sponsorships; Endorsements | 70% of Net Receipts |
| All Other Entertainment Industry Related Income[2] | 50% of Net Receipts |

*See* MRA [ECF 1-1] at Section I.7.

18)   The apportionment of the aforementioned "Net Receipts" is defined by the MRA as follows:

5. "Company's Net Receipts" shall mean Gross Receipts[1] less any and all deductions, costs and expenses incurred in connection with this Agreement and/or on behalf of Artist (exclusive of Artist Advances) which shall all be 100% fully recoupable by Company, including but not limited to: advances or deposits from third parties which are subject to refund until earned; Recording Budget; Marketing Fund; Recording Costs; Record artwork; music video costs, distribution costs, independent promotion costs; all costs incurred by Company in connection with the manufacture, distribution, development, sale, advertising, protection of rights and collection of money associated with Masters, Licensed Marks and merchandise; all costs incurred by Company to develop and maintain your "Official" websites and/or social media sites; trademark application costs, reasonable attorneys' fees actually incurred, costs of goods sold; costs and expenses of the prosecution, defense or settlement of claims or suits related to Artist including without limitation those pursuant to Artist's services rendered hereunder (but specifically excluding costs and expenses of the prosecution, defense or settlement of claims or suits related to the Panda Dispute which shall be considered Artist Advances); insurance payments; hall fees; security fees; freight, shipping and handling; road personnel salaries; lodging and transportation; returns; trade discounts, mark-downs, chargebacks; sales taxes; commissions payable by Company to third parties including collection agents, and marketing and advertising expenses. For purposes of clarification, no Gross Receipts shall be earned with respect to merchandise furnished on a "no-charge" basis, for promotional, marketing, or goodwill purposes, or for discontinued or distress sales of merchandise at or below manufacturing costs, or for promotional sales (for example, sales to you).

*See* MRA [ECF 1-1] at Section VIII.5.

19)   The "Term" of the MRA is governed by Section II.1 thereof [ECF 1-1 at Section II.1].   Pursuant to Section II.1, the "Term" of the MRA is determined by the following language:

1. Term. (a) The term of this Agreement (the "Term") shall consist of an initial contract period (the "Initial Contract Period"), plus four (4) separate, consecutive options (each an "Optional Contract Period") to extend the Term for a "Second," "Third," "Fourth" and "Fifth" contract period under the terms and conditions set forth hereinbelow (each contract period shall individually and collectively be referred to as "Contract Period"). The Initial Contract Period shall commence as of the date set forth in the initial paragraph on page 1 of this Agreement and shall continue until the date twelve (12) months after the initial U.S. commercial release of the First Album (as defined below) or unless otherwise terminated sooner by Company. Each Optional Contract Period

---

[1] "Gross Receipts" is defined in the MRA as follows: "Gross receipts" shall mean all non-refundable monies actually collected by Company in connection with this Agreement." *See* MRA at Section VIII.4.

> shall commence upon expiration of the immediately preceding Contract Period and shall continue until twelve (12) months after the initial commercial release in the United States of the Album constituting the recording commitment for such Contract Period. Each Optional Contract Period shall be automatically exercised by Company unless Company gives you written notice to the contrary at any time prior to the expiration of the then current Contract Period.

*See* MRA [ECF 1-1] at Section II.1.

20)   As a result, the "Term" of the MRA is contingent on the release dates of "First Album", "Second Album," "Third Album," "Fourth Album," and "Fifth Album."  *See* MRA [ECF 1-1] at Section II.

21)   The Term of the MRA commenced on the effective date of March 15, 2019.

22)   Following the commencement of the MRA, the "First Album," titled "La BESTia" was released in the United States in or around the middle of 2019.

23)   Upon release of the First Album, the Initial Contract Period set forth in the MRA was to last until "twelve (12) months after the initial U.S. commercial release of the First Album (as defined below) or unless otherwise terminated sooner by Company."  *See* MRA [ECF 1-1] at Section II.1.

24)   Immediately following the expiration of the Initial Contract Period twelve months after the release of the First Album, the first of the four "Optional Contract Period[s]" commenced automatically.  This period is referred to as the "First Option Period."

25)   The term of the First Option Period would last from the day immediately after the end of the Initial Contract Period through and including the period of time twelve months after the release of the Second Album.

26)   The "Second Album," titled "Genelipsis" was released in 2022.

27)   As a result the First Option Period ended twelve months after the release of the "Second Album" titled "Genelipsis."

28)   Immediately following the expiration of the First Option Period, the second of the four "Optional Contract Period[s]" commenced automatically.  This period is referred to as the "Second Option Period."

29)   The Second Option Period commenced twelve months after the release of "Genelipsis" in 2022 and is not set to expire until twelve months after the US release of a Third Album.

30)   Because a Third Album has not been released in the US pursuant to the MRA and because Primo Boyz Records did not terminate the MRA, the Second Option Period remains active and ongoing to the current date.

31)   In the event a Third Album is released in the US pursuant to the MRA, the Second Option Period would end twelve months thereafter.

32)   Immediately following the end of the Second Option Period, the Third Option Period would automatically commence for a term that would continue until twelve months after the release of the next album.  This process would continue in sequence until (i) the end of the Fourth Option Period twelve months after the US release of the "Fifth Album"; (ii) upon termination by Primo Boyz Records pursuant to the terms of the MRA; or (iii) upon the end of any Optional Contract Period if Primo Boyz Records were to give affirmative notice of an intent to not automatically exercise the right to said Optional Contract Period.

33)   Because Primo Boyz Records has neither (i) terminated the MRA, nor (ii) given affirmative notice of non-renewal of the automatic renewals for the Optional Contract Periods, the Second Option Period remains active under the MRA and will continue to remain active for subsequent releases of Albums up to and including twelve months following the release of the "Fifth Album."

34)     During the period of time while the MRA remains in effect, which has been continuously from March 15, 2019 through the present date and thereafter as set forth above, Plaintiff Almighty was and remains subject to various obligations under the MRA.

35)     Even after the end of the "Initial Contract Period" and all of the "Optional Contract Periods" under the MRA, which have not yet completed, Primo Boyz Records would continue to retain ***in perpetuity*** all of the rights granted to Primo Boyz Records under the MRA related to the rights and privileges associated with all of the albums and other works for hire generated by Plaintiff Almighty during Term of the MRA. *See* MRA [ECF 1-1] at Section II.5; Section III.1; Section III.2.

36)     Additionally, for all "Concerts" or "Tours," the MRA grants Primo Boyz Records certain exclusive rights as set forth below:

> You hereby grant, ***for the Term plus twelve (12) months following delivery of the last Album hereunder*** and in the Territory, to Company and/or its assigns and licensees the following exclusive rights to: (a) promote your live performances, including but not limited to concerts and tours; (b) identify Company as the exclusive promoter thereof; (c) selloff your live performances to a third party local promoter; (d) to use your Licensed Marks in connection with the performances, concerts, tours, tour website, including the advertising and promotion thereof; (e) secure sponsorship agreements granting sponsorship rights in connection with your performances, concerts and tours, including "tie-ins" where services or products are given in lieu or in addition to monetary consideration, provided that each sponsorship agreement is subject to your prior approval (which shall not be unreasonably withheld); (f) license and otherwise authorize third parties to make radio and/or Internet broadcasts of your performances and concerts; (g) secure agreements for the filming of your performances and concerts; and (h) synchronize and publicly perform Compositions in the advertisements of your performances, concerts and the tours and tour website.

*See* MRA [ECF 1-1] at Section IV (emphasis added).

37)     For "Merchandising," the MRA grants Primo Boyz Records certain exclusive rights as set forth below:

> ***During the Term plus twelve (12) months following delivery of the last Album hereunder***, you hereby grant to Company and/or its assigns and licensees the sole and exclusive perpetual worldwide right and license (with such right and

license continuing on a non-exclusive basis after such twelve (12) month period) to utilize the Licensed Marks in connection with the manufacture, distribution, sale and promotion of merchandise through any and all manners and channels of distribution whatsoever, including in and about the venue and area of a performance and through your fan clubs and the sole and exclusive right and license to establish and to utilize the Licensed Marks in connection with your website. You hereby grant Company the unrestricted right to sublicense to any third party the manufacture, distribution, supply, and promotion of merchandise hereunder, in whole or in part and the right to enter into joint distribution arrangements with third parties for the distribution of merchandise. Company shall submit to you, for your approval, a deal memo detailing the specifics of each such proposed license or advertisement. You shall, within five (5) days following receipt by you of each proposed deal memo, advise Company as to whether such proposed deal memo is accepted or rejected. Your approval shall be deemed given in the event that you shall fail to submit objections in accordance with the foregoing sentence.

*See* MRA [ECF 1-1] at Section V (emphasis added).

38) The MRA also grants additional rights and privileges to Primo Boyz Records as set forth within the terms of the MRA that are not specifically alleged herein above.

## II.   THE ASSIGNMENT TO LA FUNDA

39) Primo Boyz Records and La Funda entered into an "Assignment Amendment" dated April 17, 2025  (hereinafter the "Assignment Agreement") assigning some of the rights and obligations under the MRA between Primo Boyz Records and Plaintiff Almighty.

40) Under the Assignment Agreement, Primo Boyz Records assigned to La Funda all of the rights and responsibilities under the MRA with the exception of "Delivered Records and the Prior Publishing," which were retained by Primo Boyz Records.

41) The "Delivered Records" is defined as follows under the Assignment Agreement as follows:

WHEREAS, in accordance with the 2019 Artist Agreement, Artist has delivered to Assignor the First Album titled "El Bestia", the Second Album titled "Genelypsis" and all associated remixes and music videos, and Artist has or shall deliver and assign to Assignor all sound recordings (and all underlying compositions and associated remixes and music videos) owned or controlled by Artist prior to the 2019 Artist Agreement including without limitation all records, underlying compositions and all remixes and music videos of same listed in Exhibit B hereto (collectively the "Delivered Records").

*See* Assignment Agreement at p. 1.

42)   The "Prior Publishing" is defined as follows under the Assignment Agreement as follows:

> WHEREAS, in accordance with the 2019 Artist Agreement, Assignor's designee PRIMO BOYZ MUSIC PUBLISHING, LLC ("PBMP") is and shall remain the exclusive music publisher for Artist with respect to the Delivered Records and Artist together with Artist's designee LA INDUSTRIA DE LOS INMORTALES ("LIDLI") has or shall deliver and assign to PBMP an undivided 100% interest in all of Artist's music publishing prior to the Effective Date including without limitation all music publishing with respect to the Delivered Records (collectively the "Prior Publishing").

*See* Assignment Agreement at p. 1.

43)   Collectively the "Delivered Records" and the "Prior Publishing" are referred to in the Assignment Agreement as the "Reserved Rights."  *See* Assignment Agreement at p. 1.

44)   All other rights and obligations, other than the "Reserved Rights," were fully assigned by Primo Boyz Records to La Funda in accordance with the Assignment Agreement.

### III.   PLAINTIFF ALMIGHTY'S VIOLATION AND ANTICIPATORY REPUDIATION OF THE MRA

45)   Plaintiff Almighty has violated the terms of the MRA by, *inter alia*,

(a) writing and recording music for his own benefit or for the benefit of third-parties and not remitting the proceeds thereof to Primo Boyz Records;

(b) releasing albums that should have been delivered to Primo Boyz Records and not remitting the proceeds thereof to Primo Boyz Records;

(c) wrongfully utilizing the grant of rights to Primo Boyz to the music for hire set forth in the MRA and not remitting the proceeds thereof to Primo Boyz Records;

(d) circumventing the rights vested in Primo Boyz Records with respect to "Concerts" and "Tours" as set forth Section IV of the MRA, including the failure to remit the proceeds thereof to Primo Boyz Records;

(e) circumventing the rights vested in Primo Boyz Records with respect to "Merchandising" as set forth Section V of the MRA, including the failure to remit the proceeds thereof to Primo Boyz Records;

(f) circumventing the rights vested in Primo Boyz Records with respect to "Sponsorships and Endorsements" as set forth Section VI of the MRA, including the failure to remit the proceeds thereof to Primo Boyz Records;

(g) circumventing the rights vested in Primo Boyz Records with respect to "Management" as set forth Section VII of the MRA, including the failure to remit the proceeds thereof to Primo Boyz Records;

(h) entering into contracts with third-parties that were prohibited by the MRA without the express consent of Primo Boyz Records, including the failure to remit the proceeds thereof to Primo Boyz Records;

(i) otherwise wrongfully diverting proceeds that should have been remitted to Primo Boyz Records pursuant under the MRA;

(j) giving notice of his intention commit an anticipatory breach and repudiation of the MRA and actually following through with said anticipatory breach and repudiation of the MRA;

(k) failing to advise Company of all offers of employment, and all inquiries concerning your career in the Entertainment Industries, as required by Section VII.6 of the MRA;

(l) performing, or failing to perform, various other actions in violation of the MRA that have yet to be fully discovered by Primo Boyz Records.

46)   As a result of Plaintiff Almighty's violations of the MRA, Primo Boyz Records has suffered, and continues to suffer, actual damages in an amount in excess of $75,000.00.

### IV.   TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP BY ALBUJA AND ROCHA

47)   On information and belief, Albuja and Rocha materially and tortuously interfered with the contractual relationship between Primo Boyz Records and Plaintiff Almighty.

48)   A valid contract existed between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

49)   Albuja and Rocha had actual knowledge of the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

50)   Albuja and Rocha provided encouragement and material assistance to Plaintiff Almighty to induce him into rupturing the contractual relationships between Plaintiff Almighty and Primo Boyz Records, including, but not limited to, the breaches of the MRA alleged herein above.

51)   Albuja and Rocha intentionally and unjustifiably interfered with the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

52)   Albuja and Rocha's tortious interference resulted in the actual breach and disruption of the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

53)   Part of the tortious interference resulted in, *inter alia*, a performance by Plaintiff Almighty in Miami-Dade County, Florida in September 2025 that was in violation of the MRA and was encouraged, assisted, and induced by Albuja and Rocha.

54)   As a result of Albuja and Rocha's tortious interference, Primo Boyz Records has suffered, and continues to suffer, actual damages in an amount in excess of $75,000.00.

## CAUSES OF ACTION

### Count I – Declaratory Relief (as to Plaintiff and La Funda Music)

55)   Primo Boyz Records realleges and incorporates all preceding paragraphs 1–54 as if fully set forth herein.

56)   The MRA is a valid and enforceable agreement under Florida law.

57)   The "Term" of the MRA commenced on March 15, 2019 and remains actively in effect by virtue of the Initial Contract Period, plus the four (4) separate, consecutive options thereafter.

58)   Because Primo Boyz Records has neither (i) terminated the MRA, nor (ii) given affirmative notice of non-renewal of the automatic renewals for the Optional Contract Periods, the Second Option Period remains active under the MRA and will continue to remain active for subsequent releases of Albums up to and including twelve months following the release of the "Fifth Album."

59)   A substantial and immediate legal controversy exists between Plaintiff Almighty and Primo Boyz Records concerning the parties' respective rights, obligations, and claims to intellectual property, contractual authority, and revenue derived from Plaintiff's music, brand, and likeness pursuant to the MRA.

60)   Accordingly, Plaintiff seeks a declaration from this Court pursuant to 28 U.S.C. § 2201 that (i) the MRA is a valid and enforceable agreement under Florida law; (ii) the Term of the MRA has not expired; and (iii) Primo Boyz Records' rights and privileges under the MRA remain in full force and effect.

61)   Due to the Assignment Agreement, La Funda is a necessary party to the declaratory relief sought within this cause of action.

WHEREFORE, Primo Boyz Records respectfully requests that the Court declare that (i) the MRA is a valid and enforceable agreement under Florida law; (ii) the Term of the MRA started on March 15, 2019 and has run continuously and not expired, and will not expire until twelve months after the release of the "Third Album," "Fourth Album," and "Fifth Album" in the United States unless otherwise terminated by Primo Boyz Records in accordance with the terms of the MRA; (iii) Primo Boyz Records' rights and privileges under

the MRA remain in full force and effect; and (iv) grant such other and further relief as the Court deems just and proper.

## Count II - Breach of Contract (against Plaintiff)

62)   Primo Boyz Records realleges and incorporates all preceding paragraphs 1–54 as if fully set forth herein.

63)   A valid and enforceable contract exists between Primo Boyz Records and Plaintiff Almighty as memorialized in the MRA dated March 15, 2019.

64)   The Term of the MRA commenced on March 15, 2019 and has run continuously and not expired, and will not expire until twelve months after the release of the "Third Album," "Fourth Album," and "Fifth Album" in the United States unless otherwise terminated by Primo Boyz Records in accordance with the terms of the MRA.

65)   Plaintiff Almighty has materially breached the terms of the MRA by, *inter alia*,

(a) writing and recording music for his own benefit or for the benefit of third-parties and not remitting the proceeds thereof to Primo Boyz Records;

(b) releasing albums that should have been delivered to Primo Boyz Records and not remitting the proceeds thereof to Primo Boyz Records;

(c) wrongfully utilizing the grant of rights to Primo Boyz to the music for hire set forth in the MRA and not remitting the proceeds thereof to Primo Boyz Records;

(d) circumventing the rights vested in Primo Boyz Records with respect to "Concerts" and "Tours" as set forth Section IV of the MRA, including the failure to remit the proceeds thereof to Primo Boyz Records;

(e) circumventing the rights vested in Primo Boyz Records with respect to "Merchandising" as set forth Section V of the MRA, including the failure to remit the proceeds thereof to Primo Boyz Records;

(f) circumventing the rights vested in Primo Boyz Records with respect to "Sponsorships and Endorsements" as set forth Section VI of the MRA, including the failure to remit the proceeds thereof to Primo Boyz Records;

(g) circumventing the rights vested in Primo Boyz Records with respect to "Management" as set forth Section VII of the MRA, including the failure to remit the proceeds thereof to Primo Boyz Records;

(h) entering into contracts with third-parties that were prohibited by the MRA without the express consent of Primo Boyz Records, including the failure to remit the proceeds thereof to Primo Boyz Records;

(i) otherwise wrongfully diverting proceeds that should have been remitted to Primo Boyz Records pursuant under the MRA;

(j) failing to advise Company of all offers of employment, and all inquiries concerning your career in the Entertainment Industries, as required by Section VII.6 of the MRA;

(k) performing, or failing to perform, various other actions in violation of the MRA that have yet to be fully discovered by Primo Boyz Records.

66)   Primo Boyz Records has fully performed under the MRA, or was excused from further performance as a result of Plaintiff Almighty's prior material breaches of the MRA.

67)   As a direct and proximate result of Plaintiff Almighty's breaches, Primo Boyz Records has suffered actual damages and other forms of damages, including but not limited to attorneys' fees and costs, in an amount to be determined at trial.

WHEREFORE, Primo Boyz Records respectfully requests that the Court enter judgment against Plaintiff Almighty, and award compensatory and consequential damages; attorneys' fees; and costs as permitted by law; and such other and further relief as the Court deems just and proper.

## Count III - Anticipatory Repudiation (against Plaintiff)

68)   Primo Boyz Records realleges and incorporates all preceding paragraphs 1–54 as if fully set forth herein.

69)   A valid and enforceable contract exists between Primo Boyz Records and Plaintiff Almighty as memorialized in the MRA dated March 15, 2019.

70)   The Term of the MRA commenced on March 15, 2019 and has run continuously and not expired, and will not expire until twelve months after the release of the "Third Album," "Fourth Album," and "Fifth Album" in the United States unless otherwise terminated by Primo Boyz Records in accordance with the terms of the MRA.

71)   Plaintiff Almighty has committed a material anticipatory breach and/or anticipatory repudiation of the MRA by, inter alia, giving notice of his intention commit an anticipatory breach and repudiation of the MRA and actually following through with said anticipatory breach and repudiation of the MRA.

72)   As a direct and proximate result of Plaintiff Almighty's anticipatory breach and/or anticipatory repudiation of the MRA, Primo Boyz Records has suffered actual damages and other forms of damages, including but not limited to attorneys' fees and costs, in an amount to be determined at trial.

WHEREFORE, Primo Boyz Records respectfully requests that the Court enter judgment against Plaintiff Almighty, and award compensatory and consequential damages; attorneys' fees; and costs as permitted by law; and such other and further relief as the Court deems just and proper.

## Count IV - Tortious Interference (against Albuja)

73)   Primo Boyz Records realleges and incorporates all preceding paragraphs 1–54 as if fully set forth herein.

74)   A valid contract existed between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

75)   Albuja had actual knowledge of the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

76)   Albuja provided encouragement and material assistance to Plaintiff Almighty to induce him into rupturing the contractual relationships between Plaintiff Almighty and Primo Boyz Records, including, but not limited to, the breaches of the MRA alleged herein above.

77)   Albuja intentionally and unjustifiably interfered with the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

78)   Albuja's tortious interference resulted in the actual breach and disruption of the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

79)   Part of the tortious interference resulted in, *inter alia*, a performance by Plaintiff Almighty in Miami-Dade County, Florida in September 2025 that was in violation of the MRA and was encouraged, assisted, and induced by Albuja.

80)   As a direct and proximate result of Albuja's tortious interference, Primo Boyz Records has suffered actual damages and other forms of damages in an amount to be determined at trial.

WHEREFORE, Primo Boyz Records respectfully requests that the Court enter judgment against Albuja, and award compensatory and consequential damages; and grant such other and further relief as the Court deems just and proper.

## **Count V - Tortious Interference (against Rocha)**

81)   Primo Boyz Records realleges and incorporates all preceding paragraphs 1–54 as if fully set forth herein.

82)   A valid contract existed between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

83)   Rocha had actual knowledge of the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

84)   Rocha provided encouragement and material assistance to Plaintiff Almighty to induce him into rupturing the contractual relationships between Plaintiff Almighty and Primo Boyz Records, including, but not limited to, the breaches of the MRA alleged herein above.

85)   Rocha's intentionally and unjustifiably interfered with the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

86)   Rocha's tortious interference resulted in the actual breach and disruption of the contractual relationship between Plaintiff Almighty and Primo Boyz Records, as memorialized in the MRA.

87)   Part of the tortious interference resulted in, *inter alia*, a performance by Plaintiff Almighty in Miami-Dade County, Florida in September 2025 that was in violation of the MRA and was encouraged, assisted, and induced by Rocha.

88)   As a direct and proximate result of Rocha's tortious interference, Primo Boyz Records has suffered actual damages and other forms of damages in an amount to be determined at trial.

WHEREFORE, Primo Boyz Records respectfully requests that the Court enter judgment against Rocha, and award compensatory and consequential damages; and grant such other and further relief as the Court deems just and proper.

## Count VI – Civil Conspiracy (against Albuja and Rocha)

89)   Primo Boyz Records realleges and incorporates all preceding paragraphs 1–54 as if fully set forth herein.

90)   This is an action for civil conspiracy against Albuja and Rocha.

91)   There was an agreement between, inter alia, Albuja and Rocha, to conduct in activities to interfere with, subvert, and otherwise disrupt the contractual relationship between Primo Boyz Records and Plaintiff Almighty.

92)   The agreement between, inter alia, Albuja and Rocha, was made to accomplish an unlawful act or a lawful act by unlawful means to interfere with, subvert, and otherwise disrupt the contractual relationship between Primo Boyz Records and Plaintiff Almighty.

93)   On information and belief, Albuja or Rocha have engaged in one or more overt acts in furtherance of the conspiracy by encouraging and assisting with Plaintiff Almighty's breach of the MRA.

94)   As a direct and proximate result of Albuja and Rocha's civil conspiracy, Primo Boyz Records has suffered actual damages and other forms of damages in an amount to be determined at trial.

WHEREFORE, Primo Boyz Records respectfully requests that the Court enter judgment against Albuja and Rocha, jointly and severally; award compensatory and consequential damages; and grant such other and further relief as the Court deems just and proper.

Dated: December 1, 2025

**HIRZEL DREYFUSS & DEMPSEY, PLLC**
*Counsel for Plaintiff*
1200 Anastasia Ave., Suite 240
Coral Gables, Florida 33134
Telephone: (305) 615-1617
Facsimile: (305) 615-1585

By: */s/ Patrick G. Dempsey*
    **LEON F. HIRZEL**
    Florida Bar No. 085966
    hirzel@hddlawfirm.com
    **PATRICK G. DEMPSEY**
    Florida Bar No. 027676
    dempsey@hddlawfirm.com

## CERTIFICATE OF SERVICE

I certify that on December 1, 2025, a true copy of the foregoing document was served on opposing counsel by electronic mail.

Dated: December 1, 2025

**HIRZEL DREYFUSS & DEMPSEY, PLLC**
*Counsel for Plaintiff*
1200 Anastasia Ave., Suite 240
Coral Gables, Florida 33134
Telephone: (305) 615-1617
Facsimile: (305) 615-1585

By: */s/ Patrick G. Dempsey*
    **PATRICK G. DEMPSEY**
    Florida Bar No. 027676
    dempsey@hddlawfirm.com